HARTZ, Circuit Judge,
dissenting in part.
I concur in all of Judge Kelly’s impressive opinion except for the section entitled “Purported Amendment of Plan.” I would affirm the district court’s decision that the Plan was amended to provide for self-direction of investments by the participants. Nevertheless, even if the Plan was amended, Bank One may be subject to liability for losses arising from the self-directed investments in Hedged. Therefore, I agree with the majority that reversal is necessary.
As I understand the majority opinion, its view of events is that (1) each participant in the Plan wanted to self-direct the investments in the participant’s individual account, but (2) none of the participants executed the self-direction documents required by § 8.10 of the Plan, so (3) the desires of the participants had no legal effect, and (4) Bank One continued to have full responsibility for all Plan investments after December 31,1987.
I respectfully disagree. I understand the district court’s findings to say (although I would have no objection to a remand for clarification on the matter) that everyone, including at least a majority of the participants, wanted to change the Plan itself. Under the change the Trustee no longer would control the investments but, rather, each participant would direct the investments for the participant’s individual account. Because the Plan as a whole was being changed, there was no need for individual participants to follow the procedures of § 8.10 to carry into effect a desire for self-direction. Indeed, a participant would no longer have the option of choosing between self-direction or Trustee-direction of investments. After the change, all participants had to self-direct because the Trustee would no longer manage investments.
Even under this version of events, Bank One does not necessarily prevail on the liability issue. To escape liability it would still need to establish affirmative answers to the following questions: (1) Was the change to the Plan properly authorized? (2) Was the change properly documented? (3) Did the change sufficiently satisfy 29 U.S.C. § 1104(c)(1) to protect Bank One from liability under ERISA with respect to post-change investments of Plan assets? In my view, affirmative answers to (1) and (2) were established, but I would remand to the district court to answer the third question.
Returning to my disagreement with the majority opinion, I believe that the issue dividing us is an issue of fact rather than law. The opinions in Dooley v. American Airlines, Inc., 797 F.2d 1447 (7th Cir.1986), Stewart v. National Shopmen Pension Fund, 730 F.2d 1552 (D.C.Cir.1984), and their progeny are of no assistance in the matter. In each case the court held that a change in benefits was permissible under the terms of the plan. Therefore, the change did not need to meet statutory requirements for plan amendments or obtain the approval necessary for plan amendments. I do not read those decisions as holding that a plan cannot be amended when the ultimate result could be achieved without an amendment. Nor am I aware of any other authority for such a peculiar proposition.
To determine what actually happened, one must consider the context. The context here lends substantial support to the district court’s finding that the Plan was amended. In 1987 Bank One, the Plan Trustee, decided to discontinue managing assets for trust department customers because its sole trust investment manager *1251 left the bank. Accordingly, Bank One informed the Plan that the Plan would need to choose between obtaining a new Trustee or converting to a participant-directed plan. The issue was not whether to permit each Plan participant to self-direct the investments in the participant’s account. Section 8.10 of the Plan already permitted a participant to do that. The issue was whether to change the nature of the Plan by completely substituting self-directed investing for Trustee investing. The Plan Advisory Committee (composed of three of the Plan’s five participants), reflecting the desire of the participants, voted for self-direction. (It would make no sense for the Committee to vote to allow Plan participants to elect self-direction of investments under § 8.10, because the only approval a participant needed under § 8.10 was approval of the Trustee.) After the change, no participant retained the option to have Bank One continue managing the investments.
I acknowledge that the record is not without ambiguity regarding what happened. A rational fact finder might decide that the Advisory Committee was merely advising the Plan participants that each could go ahead and self-direct investments. (Even then, however, one would need to consider the possibility that the Plan was amended to eliminate the specific requirements of § 8.10.) But the rational fact finder with responsibility in this case — the district court — found otherwise. We should defer to the district court’s findings if they were not clearly erroneous. See Tosco Corp. v. Koch Ind., Inc., 216 F.3d 886, 892 (10th Cir.2000).
I now turn to the questions whether the Plan amendment was properly authorized and whether it was properly documented. Section 14.02 of the Plan gives the Employer the right to amend the Plan, although any change that “affects the rights, duties, or responsibilities of the Trustee, the Plan Administrator or the Advisory Committee” requires the written consent of the affected person. This provision complies with the ERISA requirement that a plan “provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan.” 29 U.S.C. § 1102(b)(3); see Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995).
The Crosby Plaintiff contends that the amendment was not properly approved. In particular, it complains of the absence of a corporate resolution by The Crosby Group, Inc. But Colorado corporate law is realistic about what is required. “As to closely held corporations, in particular, action taken informally can be valid even though' corporate formalities are not followed. Thus, corporations with few shareholders, and in which directors personally and directly conduct the business, act with little formality.” White v. Thatcher Fin. Group, Inc., 940 P.2d 1034, 1037 (Colo.Ct.App.1996). Here, Roger K. Crosby was the owner and sole director, as well as president, of The Crosby Group, Inc. His approval would constitute approval by the Employer. There is no dispute that he wished the Plan to become self-directed (he signed the Advisory Committee resolution regarding self-direction); and in any event, his subsequent conduct certainly ratified the change. See Curtiss-Wright, 514 U.S. at 85, 115 S.Ct. 1223 (noting that even if amendment was not properly authorized at the outset, it could still be ratified).
This brings me to the most troubling issue — whether the amendment was properly documented. ERISA requires that a plan “be established and maintained pursuant to a written instrument.” 29 U.S.C. § 1102(a)(1). (The Plan itself requires that any amendment be in writing, but *1252 there is no need to consider this requirement separately.) The instrument, however, need not be a single document. See Rinard v. Eastern Co., 978 F.2d 265, 268 n. 2 (6th Cir.1992).
In my view, the following document satisfies the requirements of ERISA:
THE CROSBY GROUP
MEMORANDUM
TO: Profit Sharing Plan Participants
FROM: Advisory Committee
RE: Self direction
DATE: December 29,1987
In order to allow participants to direct their portion of the profit sharing plan, the Administrative Committee has established participant direction of investments with the following guidelines:
— Directions will be made semi-annually: January 1st and July 1st. An election form will be distributed to each participant three weeks prior to the direction date (see attached) and must be returned to Louise one week prior to the direction date. For this first time, given the shortness of time, please return ASAP.
— There are six options for investment; a minimum of 25% must be invested in any one option. The options are:
Income fund (bank’s bond fund)
Equity fund (bank’s stock fund)
Hedged account
Certificates of Deposit
6 month, 1 year or 2 year
— Both vested and non-vested portions of a participant’s account are to be self-directed as a whole.
— Accounting fees to be paid by The Crosby Group, Inc.
— The Advisory Committee will provide each participant with the most currently available earnings information about the six options at the time the election forms are distributed.
Although the document does not bear the title “Amendment,” “there is no requirement that documents claimed to collectively form the employee benefit plan be formally labelled as such,” Horn v. Berdon, Inc. Defined Benefit Pension Plan, 938 F.2d 125, 127 (9th Cir.1991), nor is there a requirement that an amendment be so titled, see id. (corporate resolution was a plan amendment); cf. Normann v. Amphenol Corp., 956 F.Supp. 158, 162-63 (N.D.N.Y.1997) (corporate resolution to amend plan constituted a plan' amendment).
I recognize that the document is not a model of clarity. For example, the first sentence speaks of “allow[ing]” participants to self-direct, but the sentence goes on to say that the committee “has established” self-direction, and the remainder of the memorandum sounds mandatory. (Also, the word “allow” may simply reflect the participants’ desire to have a self-directed plan rather than to switch trustees.) Nothing in ERISA, however, requires an amendment to be unambiguous in order to be effective. Issues of ambiguity can be resolved as a matter of trust interpretation. Here, all parties understood that the five participants were to self-direct their investments from then on, and they acted accordingly.[1]
One could argue that the December 29, 1987, memorandum is too “informal” to be part of the Plan. Miller v. Coastal Corp., *1253 978 F.2d 622, 625 (10th Cir.1992), states “that there is no liability under ERISA for purported informal -written modifications to an employee benefit plan.” But Miller does not define “informal,” and the term must be understood in the context of the case. The plaintiff had sued to obtain the benefits set forth in annual statements sent him that calculated his retirement benefits. He acknowledged that the plan itself did not provide the benefits he sought. In rejecting his claim, this court noted that granting him the requested relief would negatively impact other participants.
“ ‘[E]mployees would be unable to rely on these plans if their expected retirement benefits could be radically affected by funds dispersed to other employees pursuant to oral agreements.’ [Nachwalter v. Christie, 805 F.2d 956, 960 (11th Cir.1986) ] These same concerns are implicated when, as here, a plan participant tries to enforce an informal written agreement under a theory of federal common law estoppel.”
Miller, 978 F.2d at 625. The documents referred to as “informal” in Miller were documents relating to only one of many participants and thus could hardly be said to constitute part of the plan. I do not read Miller as requiring that we reject the memorandum directed to all participants as a Plan amendment. If the purpose of “formality” is to ensure that participants in a plan are properly informed of the terms of the plan, then there should be no concern here. The participants undoubtedly knew that henceforth they were to self-direct the investments in their individual accounts.
Moreover, no public policy is violated by allowing the amendment. Self-direction of investments may well be beneficial to participants. The language in Plan § 8.10 that exculpates the Trustee from certain liabilities after self-direction would seem to be designed to protect the Trustee, not the participants. Likewise, the form letter mentioned in the majority opinion (which the Plan did not require anyone to use) protects the Trustee with the language absolving the Trustee of liability. I agree that to the extent that including the exculpatory language in either § 8.10 or a form letter notified a participant of rights (or lack of them) that accrued upon self-direction, the language serves a purpose. One might contend that the exculpatory language merely informed participants of a release from liability provided by ERISA. In that regard, the exculpatory language in § 8.10 is virtually identical to that in 29 U.S.C. § 1104(c)(1)(B), which provides protection to fiduciaries with respect to a self-directed account “as determined under regulations of the Secretary [of Labor].” But to the extent that the Plan did not qualify under § 1104(c)(1)(B), which may well be the case, see In re Unisys Sav. Plan Litig., 74 F.3d 420, 448-48 (3d Cir.1996), the exculpatory language would be misleading.
In fact, public policy would seem to favor recognizing the amendment. Everyone understood what was happening. In its brief in chief the Crosby Plaintiff speaks of “what the parties sought to accomplish — participant direction.” Small businesses like The Crosby Group have enough technical hoops to jump through in conducting their affairs without the imposition of an additional formality — in this case a document labeled “Plan Amendment” signed by all necessary parties. There is no reason to stretch the law to impose such a technical requirement. Cf. Mertens v. Hewitt Assoc., 508 U.S. 248, 262-63, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (in denying cause of action to participants, Court recognizes ERISA’s “ ‘subsidiary goal of containing pension costs’ ”) (quoting Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 515, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981)).
*1254 In short, I would affirm the district court’s ruling that the Plan was amended to provide that henceforth each participant would direct the investment of assets in the participant’s individual account. The record clearly supports a determination that (1) as of January 1, 1988, the Plan operated in that fashion; (2) all persons who needed to authorize a change (amendment) to the Plan gave such authorization for self-direction; (8) the document describing the new self-direction of the Plan satisfied the writing requirement of ERISA; and (4) requiring a more “formal” amendment, such as a document labeled “Plan Amendment” and signed by those with authority to amend, would have afforded no additional protection to the interests of the Plan participants.
Unfortunately for Bank One, however, recognizing that the Plan was amended does not necessarily shield it from liability for losses from the self-directed investments in Hedged. No Plan amendment removed Bank One as Trustee of the Plan. As Trustee, Bank One still owed various fiduciary duties to the participants. I need not set forth all duties that might apply here. One will suffice. When Bank One provided Plan participants with a set of investments to choose from for their individual accounts, it had a duty to disclose material adverse information it possessed regarding any particular investment. See In re Unisys Sav. Plan Litig., 74 F.3d at 440-43. Here, the bank failed to disclose a critical piece of information— that Hedged had not been audited. As noted in the majority opinion, an audit would have disclosed fraud. I would remand for further proceedings regarding whether the Crosby Plaintiff can establish any losses arising from breach of fiduciary duty by Bank One after investments became self-directed and whether Bank One is entitled to escape liability under 29 U.S.C. § 1104(c)(1).

. The majority opinion notes the requirement of Plan § 14.02 that a Plan amendment must state an effective date. The Crosby Plaintiff's briefs do not complain about a violation of that requirement. The natural reading of the document is that self-direction was to begin immediately, and everyone acted as if that were the case.